IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| THOMAS J. BECKMAN, | * | |
| Plaintiff, | * | |
| v. | * | Civil No. TJS-16-4090 |
| MONTGOMERY COUNTY HOUSING OPPORTUNITIES COMMISSION, | * | |
| | * | |
| Defendant. | | |

\* \* \* \* \* \*

**MEMORANDUM OPINION**

By the stipulation of the parties, the Court conducted a one-day bench trial on September 23, 2019.

Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court must make specific findings of fact and state conclusions of law separately in any action tried without a jury. In doing so, the Court must appraise the testimony and demeanor of the witnesses, assess and evaluate the credibility of the witnesses, weigh the evidence, and choose among conflicting inferences and conclusions. In doing so, and to comply with the Rule, the Court "need only make brief, definite, pertinent findings and conclusions upon the contested matters, as there is no need for overelaboration of detail or particularization of facts." *Wooten v. Lightburn*, 579 F. Supp. 2d 769, 772 (W.D. Va. 2008). Rule 52 does not require the court to make findings on all facts presented or to make detailed evidentiary findings; if the findings are sufficient to support the ultimate conclusion of the court they are sufficient. *Darter v. Greenville Comm. Hotel Corp.*, 301 F.2d 70, 75 (4th Cir. 1962).

Based on an evaluation of all of the evidence in the record, including the exhibits admitted by the plaintiff and the defendant, the testimony of the witnesses, the inferences to be drawn from

the evidence, and the arguments of the parties, I make the following findings of fact and conclusions of law:

I. **FINDINGS OF FACT**

1. At all times relevant to this case, Plaintiff Thomas Beckman ("Mr. Beckman") was the owner of a property rented to a family (the "family") that received a rental subsidy through the family's participation in Montgomery County's Housing Choice Voucher Program.

2. Plaintiff and Defendant Montgomery County Housing Opportunities Commission (the "HOC") entered into a contract titled "Housing Assistance Payment Contract." I will refer to this as the "HAP Contract." The signed version of the contract has been lost by both parties, but the parties stipulated that they were bound by the contract and that the terms of the contract are standard. A copy of the HAP Contract is filed at ECF No. 72-3 and was introduced as Joint Exhibit 1.

3. Initially, Mr. Beckman charged the family monthly rent in the amount of $2,571. In the second year of the family's tenancy, Mr. Beckman charged monthly rent in the amount of $2,700, which the HOC determined to be a reasonable rent amount.

4. The HOC made annual adjustments to the utility allowance for properties across the region. The utility allowances used by the HOC in this case were correct.

5. The relevant provisions of the HAP Contract provide that the HOC will determine the amount of the family's monthly housing assistance payment "in accordance with HUD requirements for a tenancy under the voucher program" and that Defendant will notify the family tenant and the owner of any changes in the amount of the housing assistance payment. I will refer to the housing assistance payment as the "subsidy." The acronym "HUD" refers to the United States Department of Housing and Urban Development.

6. The HOC's calculation of the subsidy was at all relevant times governed by Section 982 of Title 24 of the Code of Federal Regulations. In addition, the HOC was required to comply with its own Administrative Plan. Chapters 6 and 7 of the HOC's Administrative Plan ("Administrative Plan") specifically address the HOC's calculation of a tenant family's subsidy.

7. The HOC's Administrative Plan is the governing document that provides how the HOC will administer the Housing Choice Voucher Program, *see* 24 C.F.R. § 982.1(a)(1), in accordance with HUD requirements. The Administrative Plan has been approved by the HOC's Board of Commissioners and by HUD. A central purpose of the Administrative Plan is to state how the HOC will administer the discretionary program requirements of the Housing Choice Voucher Program. The Administrative Plan was created to comply with the requirements listed in 24 C.F.R. § 982.54.

8. To determine the appropriate subsidy for the family, the HOC was required to make several calculations.

9. To begin, the HOC calculated the "gross rent" as the sum of the contract rent ($2,700 at the times relevant to Mr. Beckman's breach of contract claim) and the standard utility allowance ($435 at all relevant times).

10. The HOC also calculated the "gross family income." To calculate gross family income, the HOC added together all income received on behalf of the family other than the income that is excluded under 24 C.F.R. § 5.609. Gross family income is calculated on an annual basis.

11. The Administrative Plan (Chapter 6, Section D) permits the HOC to estimate annual income by averaging known sources of income that vary to compute an annual income or by annualizing current income. In this case, the HOC annualized the family members' current income

3

at the time that various examinations were conducted to come up with an anticipated annual income.

12. Chapter 7 of the Administrative Plan sets forth the procedures that the HOC follows to verify information related to the calculation of the subsidy, including family income, allowable deductions, and changes in family composition.

13. To verify information about a family's income, the HOC uses the five methods acceptable to HUD, in the following order of preference:

- Upfront Income Verification ("UIV") through HUD's Enterprise Income Verification system

- Third-Party Written Verification

- Third-Party Oral Verification

- Review of Documents

- Certification/Self-Declaration

14. UIV data is used to validate income reported by a family participating in the Housing Choice Voucher program and to supplement documents provided to the HOC. If UIV data is substantially different from the client reported income, the HOC next requests written third-party verification from the discrepant income source.

15. When written third-party verification is delayed or not possible, the HOC obtains oral third-party verification. When the HOC obtains oral third-party verification, an employee of the HOC completes a certification form that states a summary of the facts provided by the third party.

16. When oral third-party verification is unavailable, the HOC uses documents provided by the family for verification. Examples of documents that might be provided to the HOC

by the family include printed wage stubs, computer print-outs from the employer, and signed letters (provided that the information is confirmed by phone). Documents provided by the family are to be dated within the last 120 days of the reexamination. Pay stubs are to be current and consecutive.

17. When verification cannot be made by third-party verification or review of documents, families are required to complete a self-certification.

18. When the HOC verifies income, there are several acceptable methods of verification. In order of preference, they are: employment verification form provided by the employer, four current consecutive pay stubs or earning statements, W-2 forms plus income tax return forms, and self-certification or income tax returns (for verifying self-employment income or income from tips and gratuities).

19. When a member of a family participating in the Housing Choice Voucher Program is a full-time student, only the first $480 of that person's income will be counted towards the family income (unless the person is the head of household, co-head, or spouse). Verification of full-time student status may be made by (1) written verification from the educational institution that states that the student is taking a sufficient number of credits to be considered a full-time student by the institution, or (2) school records (including a report card) indicating enrollment for a sufficient number of credit hours to be considered a full-time student. The HOC defers to educational institutions in determining what number of credit hours is sufficient to qualify as a full-time student.

20. When a member of a family is over the age of 18 years (but not elderly or disabled) and is only a part-time student, that person is not entitled to a dependent allowance. The person's full income counts toward the gross family income.

21. The HOC also calculated "adjusted family monthly income." To calculate adjusted family monthly income, the HOC first calculates adjusted family annual income. The HOC calculates the family's adjusted annual income by subtracting from the gross family income all permissible deductions and allowances available under the regulations, including an allowance of $480 for each dependent member of the family. The family's adjusted annual income is divided by 12 for the adjusted family monthly income.

22. The HOC calculates the "Tenant Total Payment" ("TTP") as 30% of the adjusted family monthly income.

23. In this case, the HOC used the payment standard of $2,825 at all relevant times. This payment standard was not specific to the family. Instead, it was calculated by the HOC as the standard maximum subsidy possible for a family residing in a home with 5 bedrooms. *See* 24 C.F.R. § 982.1(a)(3) ("Subsidy in the HCV program is based on a local "payment standard" that reflects the cost to lease a unit in the local housing market. If the rent is less than the payment standard, the family generally pays 30 percent of adjusted monthly income for rent. If the rent is more than the payment standard, the family pays a larger share of the rent."). In this case, the family was residing in a home with 5 bedrooms.

24. To calculate the subsidy, the HOC subtracted the TTP from the payment standard of $2,825.

25. To calculate the tenant rent, the HOC subtracted the subsidy from the contract rent of $2,700.

26. The HOC made other calculations that are not material to the resolution of Mr. Beckman's breach of contract claim.

27. The subsidy that the family received from Defendant through its participation in the Housing Choice Voucher Program changed over time.

28. At all times, the HOC paid the subsidy to which the family was entitled directly to Mr. Beckman. The family was responsible for paying the difference between the contract rent of $2,700 and the subsidy. At times, the family did not pay their portion of the rent.

29. For the month of December 2014, the HOC determined that the family was entitled to a subsidy of $1,838. The HOC mistakenly paid a subsidy of $2,312 to Mr. Beckman for this month. The HOC should have only paid Mr. Beckman $1,838 for this month. Mr. Beckman was overpaid by $474 for December 2014.

30. For the month of January 2015, the HOC determined that the family was entitled to a subsidy of $1,838. The HOC mistakenly paid a subsidy of $2,312 to Mr. Beckman for this month. The HOC should have only paid Mr. Beckman $1,838 for this month. Mr. Beckman was overpaid by $474 for January 2015.

31. In total, the HOC overpaid Mr. Beckman by $948 for the months of December 2014 and January 2015.

32. For the month of February 2015, the HOC determined that the family was entitled to a subsidy of $1,838. The HOC paid Mr. Beckman $890 for this month, which included a retraction of the $948 in total overpayments for December 2014 and January 2015. The HOC calculated this amount by subtracting the overpayments ($948) from the subsidy owed to Mr. Beckman for February 2015 ($1,838), which results in a net payment to Mr. Beckman of $890. The HOC explained its calculations of the subsidy, including its overpayment in December 2014 and January 2015, in a letter to Mr. Beckman's former counsel dated May 3, 2016. *See* Plaintiff's Exhibit 13.

33. For the month of March 2015, the HOC determined that the family was entitled to a subsidy of $1,651. The HOC paid Mr. Beckman $1,651 for this month.

34. For the month of April 2015, the HOC determined that the family was entitled to a subsidy of $1,651. The HOC paid Mr. Beckman $1,651 for this month.

35. For the month of May 2015, the HOC determined that the family was entitled to a subsidy of $1,651. The HOC paid Mr. Beckman $1,651 for this month.

36. For the month of June 2015, the HOC determined that the family was entitled to a subsidy of $1,651. The HOC paid Mr. Beckman $1,651 for this month.

37. For the month of July 2015, the HOC determined that the family was entitled to a subsidy of $1,651. The HOC paid Mr. Beckman $1,651 for this month.

38. For the month of August 2015, the HOC determined that the family was entitled to a subsidy of $1,651. The HOC paid Mr. Beckman $1,651 for this month.

39. For the month of September 2015, the HOC determined that the family was entitled to a subsidy of $2,002. The HOC paid Mr. Beckman $2,002 for this month.

40. The HOC calculated the family's subsidy when the family first began participating in the Housing Choice Voucher Program. The HOC also recalculated the subsidy on an annual basis as part of the family's recertification process.

41. In addition to the HOC's initial certification and annual recertifications of the family, the HOC conducted recertifications initiated by the family. Chapter 12 of the Administrative Plan concerns recertifications. At a minimum, the HOC reexamines a family's income and household composition at least annually. In addition, when a family reports a change to household composition or a change in income, the HOC may conduct an interim reexamination. If the recertification or reexamination results in a change in the subsidy that the tenant is entitled

to, the HOC mails notice of the change to the owner and the tenant. The family made several requests for recertifications because of changes in the family's income and composition.

42. Mr. Beckman disputes the HOC's calculations related to the family's income and the resulting subsidy for the months of February 2015 through August 2015. Mr. Beckman does not disagree with HOC's calculation of the family's income before February 2015 or after August 2015.

43. On February 12, 2015, the HOC notified Mr. Beckman and the family that the subsidy would be reduced from $1,838 to $1,651 effective March 1, 2015. *See* Defendant's Exhibit 14.

44. The HOC's calculation of the subsidy amount of $1,651 is set forth in detail in the Family Report introduced into evidence as Defendant's Exhibit 15. This Family Report is dated February 12, 2015.

45. In Part 3, it lists the members of the family's household. As of February 12, 2015, the family was comprised of three adults (all over the age of 18 years) and 6 children (all under the age of 18 years).

46. In Part 7, the Family Report lists the family's income. The HOC determined that the gross family income for the family was $49,848. This amount is comprised of $7,020 in wages from J.C. Penney to Stephanie M., $28,788 in wages from Builders' Design & Leasing to Dwayne B., and $14,040 in wages from Panera Bread to Taylor M.[1]

47. The HOC determined that Taylor M. was a part-time student as of January 14, 2015. The HOC's determination was based on the document titled "Verification of Student Status – Post

---

[1] Because members of the family are not parties to this case, and because their full names are not material to the resolution of Mr. Beckman's claim, the Court will refer to the family members by their first name and last initial.

High School Education" that the HOC received from the educational institution at which Taylor M. was enrolled. During the spring semester of 2015, Taylor M. was enrolled in 11 credit hours, which the institution considers to be part-time student status. *See* Defendant's Exhibit 33.

48. The HOC determined that Taylor M.'s expected gross annual income for 2015 was $14,040. This determination was based on the HOC's verbal third party verification of Taylor M.'s hourly wage and hours worked per week at her employer, Panera Bread. Defendant's Exhibit 34. The HOC calculated Taylor M.'s expected gross annual income from this position by multiplying her hourly wage of $9.00 by the 30 hours that she worked per week, and then multiplying by 52 weeks.

49. The HOC determined that Taylor M. was no longer employed by Aeropostale as of January 19, 2015. This determination was based on the written representation of this employer that Taylor M. worked for the employer from November 10, 2014, through January 19, 2015. *See* Defendant's Exhibit 35.

50. The HOC determined that Stephanie M.'s expected gross annual income for 2015 was $7,020. This calculation appears to be the product of Stephanie M. working 15 hours per week at an hourly wage of $9.00, multiplied by 52 weeks. It is unclear why the HOC determined that Stephanie M. was earning this amount because Stephanie M. reported over time that she was earning more than this while working at J.C. Penney. To the extent that the HOC's determination of Stephanie M.'s income was incorrect, I find that the HOC underestimated her income.

51. The HOC determined that Dwayne B.'s expected gross annual income beginning January 21, 2015, was $28,788. This determination was based on the written third-party verification provided by Dwayne B.'s employer, Builders Design & Leasing, Inc. *See* Defendant's Exhibit 32.

52. In Part 8, the HOC determined that the family was entitled to a deduction for the dependents in the family in the amount of $2,880. Defendant's Exhibit 15 at 5. The family was entitled to this deduction because it was composed of 6 children under the age of 18. A dependent allowance of $480 per dependent was applied by the HOC.

53. The HOC determined that the family's adjusted annual income was $46,968. The HOC made this determination by subtracting the family's permissible deduction for its dependent allowance from the family gross annual income.

54. In Part 9, the HOC determined the TTP. First, the HOC determined that the family's adjusted monthly income was $3,914, which the HOC calculated by dividing the family's adjusted annual income by 12 months.

55. To calculate the TTP, the HOC took 30% of $3,914. The HOC determined that the TTP for the family was $1,174.

56. In Part 12, the HOC calculated the subsidy and the resulting tenant rent. The HOC determined that the family was entitled to a subsidy of $1,651. This is the difference between the payment standard of $2,825 and the TTP of $1,174. With a subsidy of $1,651, the HOC determined that the tenant would owe rent to Mr. Beckman in the amount of $1,049, which is the difference between the contract rent of $2,700 and the subsidy of $1,651.

57. On July 28, 2015, the HOC notified Mr. Beckman and the family that the subsidy would increase from $1,651 to $2,002 effective September 1, 2015. *See* Defendant's Exhibit 20. This increased subsidy was the result of HOC's determination that Taylor M. was a full-time student beginning August 31, 2015. *See* Defendant's Exhibit 36. As a result, all but $480 of the income that Taylor M. earned at Panera Bread was excluded from the gross family income, and

11

the family was entitled to an additional dependent allowance of $480 because Taylor M. was to be a full-time student.

58. The HOC made determinations regarding the family's income on January 21, 2015 that resulted in a subsidy in the amount of $1,387. This reduced subsidy was to take effect on March 1, 2015. *See* Defendant's Exhibit 11. However, on February 12, 2015, the HOC notified Mr. Beckman and the family that the subsidy would change to $1,651 (not $1,387) effective March 1, 2015. Defendant's Exhibit 14. The HOC paid the subsidy of $1,651 beginning on March 1, 2015.

59. Only two witnesses testified, Mr. Beckman and Ms. Hayes. The Court found both witnesses to be truthful and candid. In addition, the Court found Ms. Hayes to be credible because of her familiarity with the Administrative Plan, HUD regulations, and the HOC's practices. Ms. Hayes is currently the director of the Housing Resources Division of the HOC. In this capacity, she is responsible for the administration of the Housing Choice Voucher Program in Montgomery County, Maryland. She has worked for the HOC for 21 years.

## II. CONCLUSIONS OF LAW

1. Plaintiff's only remaining claim is for breach of contract. Plaintiff contends that Defendant breached the HAP Contract by miscalculating the subsidy, which increased the tenant's share of the rent and decreased the amount of the subsidy.

2. "To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175 (2001). The Court of Appeals of Maryland has stated that when interpreting contracts, "the clear and unambiguous language of an agreement will not give way to what the parties thought the agreement meant or intended it to

mean; where a contract is plain and unambiguous, there is no room for construction, and it must be presumed that the parties meant what they expressed." *Bd. of Trustees of State Colleges v. Sherman*, 280 Md. 373, 380 (1977). A contracting party is not bound merely by the assumptions or beliefs of the other contracting party but is instead bound by the contract itself. *Gill v. Computer Equip. Corp.*, 266 Md. 170, 179 (1972).

3. Plaintiff has not proven that Defendant breached any obligation under the HAP Contract.

4. Under Section 7(c)(1) of the HAP Contract, Defendant was required to calculate "the amount of the monthly PHA housing assistance payment [the subsidy] . . . in accordance with HUD requirements."

5. Defendant calculated the subsidy at issue in accordance with HUD requirements and in compliance with its obligations under the HAP Contract.

6. For the months of March 2015 through August 2015, the HOC determined that the family was entitled to a subsidy of $1,651. This determination was correct, and it complied with the Administrative Plan and HUD requirements. The parts of the Administrative Plan at issue in this case, namely Chapters 5, 6, 7, 11, and 12, comply with HUD regulations and requirements.

7. The HOC properly determined that Taylor M. was not a full-time student between March 2015 and August 2015. The HOC properly relied on written verification from the educational institution at which Taylor M. was a student. This document stated that Taylor M. was enrolled in 11 credit hours of classes, which made her a part-time student.

8. The HOC had no obligation under the HAP Contract, the Administrative Plan, or HUD regulations to counsel the family, Mr. Beckman, or Taylor M. regarding the number of credit hours Taylor M. was taking. To the extent that the HOC may have had an obligation to counsel

the family regarding various deductions to which they may be entitled, the HOC met this obligation by informing the family of these deductions at the initial certification briefing.

9. Similarly, the HOC had no obligation to counsel the family or Mr. Beckman as to ways by which the family might maximize the subsidy available to them under the Housing Choice Voucher Program. Rather, the HOC was only required to verify information about the family's income and composition, and to determine the subsidy available to the family under the Administrative Plan, in accordance with HUD regulations.

10. The HOC properly determined that Taylor M. would earn $14,040 in annual income from Panera Bread during 2015. This determination was properly based on the HOC's verbal third party verification of Taylor M.'s hourly wage and hours worked per week at her employer, Panera Bread. The HOC properly annualized this income.

11. Because Taylor M. was not a full-time student between February 2015 and August 2015, the HOC properly included the income that Taylor M. earned as part of the gross family income.

12. Likewise, the HOC properly calculated the incomes of Stephanie M. and Dwayne B. between February 2015 and August 2015. The HOC complied with its own Administrative Plan regarding the hierarchy of verification techniques and methods for annualizing income. The HOC was not required to use the family past income tax returns to verify income information. Doing so would have violated the Administrative Plan. Similarly, the HOC was not required to rely solely on the Employment Income Verification system to verify the family's income. Doing so would have violated the Administrative Plan as well as HUD's EIV policies.

13. The HOC paid Mr. Beckman the correct subsidy for the months at issue in this case (February 2015 through August 2015).

14. The HOC did not underpay Mr. Beckman in February 2015. Rather, the HOC properly retracted the overpayments that it had made to him in previous months, which resulted in a lower net payment to Mr. Beckman for February 2015. In total, Mr. Beckman received the payments to which he was entitled.

15. The HOC properly paid a subsidy in the amount of $1,651 to Mr. Beckman for the months of March 2015 through August 2015.

16. The parties do not dispute the HOC's calculations for the remaining months of family's tenancy, at least with respect to Mr. Beckman's only remaining claim for breach of contract. Nonetheless, the Court finds that that HOC properly calculated the subsidy to which the family was entitled for all months of the family's tenancy.

17. At all times relevant to this case, the HOC's calculation of the subsidy paid to Mr. Beckman under the HAP Contract was correct and in accordance with HUD requirements.

18. The HOC did not breach any term of the HAP Contract.

19. Because the HOC did not breach the HAP Contract, the Court is not required to make findings regarding the damages that Mr. Beckman claims. Mr. Beckman is not entitled to recover damages because he has failed to establish that the HOC breached the HAP Contract.

20. Mr. Beckman has not met his burden to show that the HOC breached the HAP Contract.

**III. CONCLUSION**

For these reasons, the Court finds that Defendant is entitled to judgment in its favor on Mr. Beckman's claim for breach of contract. Judgment will be entered separately. Once judgment is entered, the Clerk shall **CLOSE** this case.

October 8, 2019 /s/
Date Timothy J. Sullivan
United States Magistrate Judge